UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

J.S.T. CORPORATION,

      Plaintiff,

v.

      Case No. 15-13842
      Honorable Victoria A. Roberts

ROBERT BOSCH LLC, et al.,

      Defendants.

_____/

## ORDER GRANTING IN PART, DENYING IN PART, AND RESERVING RULING IN PART ON (1) PLAINTIFF'S DAUBERT MOTION [ECF Nos. 514, 515]; AND (2) DEFENDANTS' DAUBERT MOTION [ECF No. 527]

## I.    INTRODUCTION

J.S.T. Corporation ("JST") filed suit against Robert Bosch LLC,

Robert Bosch GmbH, and Bosch Automotive Products Co., Ltd.

(collectively, "Bosch") for misappropriation of trade secrets.

Before the Court are the parties' fully briefed *Daubert* motions.

JST moves to preclude the Rule 26 reports and testimony of two of

Bosch's proposed expert witnesses – Umberto Catignani ("Catignani") and

Robert Lange ("Lange").  [ECF Nos. 514, 515].

Bosch challenges six of JST's proposed experts.  It moves the Court

to: (1) strike the reports and preclude the testimony of John Sakowicz; and

(2) preclude certain testimony and portions of the reports of JST's five other proposed experts.  [ECF No. 527].

As set forth below, the Court **GRANTS IN PART, DENIES IN PART**, and **RESERVES RULING IN PART** on the parties' motions.

## II.   BACKGROUND

### A.   JST and Bosch's Relationship & the HIT2 Electrical Header Connector

JST and Bosch are automotive suppliers.

Bosch supplies General Motors ("GM") with assembled Body Control Modules ("BCM") for GM vehicles.  GM BCMs are electronic control units that control and monitor numerous electrical systems and functions of the vehicle, such as lighting, windshield wipers, air conditioning, mirrors, locks, and security systems.

JST designs and manufactures electric and electronic connectors for use in a wide range of products – including computers, appliances, machinery, control systems, and vehicles.

In 2005, Bosch retained JST to custom design, develop, and manufacture a hybrid 183-pin electrical header connector (the "HIT2") – a key component of Bosch's BCM.  The HIT2 consists of a high-precision injection molded housing with seven uniquely dimensioned pockets, 183 metal power and signal pins of various lengths assembled to protrude an

equal amount into each of their respective pickets and bent precisely to align on the opposite side into a JST tine plate.



**Figure 1: JST's HIT2 Electrical Header Connector**



**Figure 2: HIT2 within a GM Body Control Module ("BCM") Assembled by Bosch**

Functionally, the HIT2 (Figure 1) connects GM's BCM (Figure 2) to a vehicle's wire harness system (Figure 3) and enables connection of 183

3

automotive electrical circuits with a low insertion force.  The disruption of a

single connection may result in failure of a vehicle system.



Figure 3: Wire Harness for GM's BCM Connected to HIT2

JST says the HIT2 design and development required extensive JST

engineering work, including – among other things – material selection;

design validation and testing; consideration of electric contacts and

connector performance reliability; and creation of drawings, models,

prototype parts and tooling, and production methods and automation.

Importantly, Bosch says it jointly designed the HIT2 electrical connector

with JST.

As part of the development and bidding process, JST provided Bosch

with technical drawings and three-dimensional ("3D") computer-aided

design ("CAD") models of the HIT2 header ("JST's designs"), subject to a

non-disclosure agreement.  JST says the designs contained protectable

trade secrets. JST's asserted trade secrets include – among other things – HIT2's dimensions, tolerances (i.e., "the acceptable degree to which the completed part could deviate from the design dimensions," *see Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 410 (6th Cir. 2006)), material selection, and quality and production processes.

JST began producing and supplying Bosch with the HIT2 in 2008 or 2009.  In 2012, JST informed Bosch of a price increase for the HIT2; JST told Bosch that if it did not agree to the new price, it should seek a new source to supply it with the electrical connector.  Bosch issued a request for quotation seeking potential replacement suppliers for the electrical connector and eventually selected Foxconn Interconnect Technology, Ltd. ("Foxconn") as a supplier.  In 2015, GM approved the Foxconn-manufactured electrical connector, and Foxconn began producing it for Bosch.

### B.    This Action

JST brought this lawsuit against Bosch alleging misappropriation of trade secrets, among other claims.  JST alleges Bosch improperly: (1) gave JST's designs to third-party manufacturers, including Foxconn, while soliciting bids to reproduce the HIT2 electrical connector; (2) disclosed the plastic material supplier for the HIT2 connector to Foxconn; and (3)

referenced a section of JST's production part approval process ("PPAP") document on gauging.

The jury will determine if JST's information is eligible for protection as a trade secret, if Bosch misappropriated JST's information, and if Bosch's actions caused JST damages. Specifically, the jury will hear evidence concerning whether: (1) JST's HIT2 information had independent economic value because it was not generally known to, and not readily ascertainable (including through reverse engineering) by, competitors; and (2) JST used reasonable security measures to maintain the secrecy of the information.

If JST proves each element of its trade secret claim, the jury also will determine if Bosch's defenses justify its alleged use of the HIT2 header information. For example, the jury will be asked to determine: (1) whether Bosch and JST jointly designed and developed, and therefore co-own, certain HIT2 header information; (2) whether JST's demand that Bosch find a new source for the electrical connector excuses the alleged misappropriation; and (3) whether JST was damaged by the approval of additional connector suppliers.

The parties offer expert witnesses to help explain the technical nature of certain disputed issues.  Among other things, expert testimony is offered to explain: (1) the technical aspects of the Bosch and JST data in their

respective 3D CAD files; (2) whether the HIT2 and/or JST's alleged trade secrets are readily ascertainable through reverse engineering; (3) whether JST's processes and materials were unique and whether its alleged trade secrets were readily available in the public domain and/or widely known in the industry; and (4) the customs and practices regarding the exchanges of information and treatment of designs by and between Tier 1 and Tier 2 suppliers – like Bosch and JST, respectively – and original equipment manufacturers – like GM – in the automotive industry.

## III.   LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

The party offering the expert testimony bears the burden to prove its admissibility by a preponderance of the evidence. *E.E.O.C. v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, 752 (6th Cir. 2014); *Flanagan v. Altria Group, Inc.*, 423 F. Supp. 2d 697, 700 (E.D. Mich. 2005) (citing *Daubert*, 509 U.S. at 592, n.10).

Parsing the language of Rule 702, a proposed expert's opinion is admissible if the party offering it establishes three things: (1) the witness is "qualified by 'knowledge, skill, experience, training, or education'"; (2) the testimony is "relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue'"; and (3) the testimony is reliable. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008). Rule 702 guides trial courts by providing "general standards to assess reliability: whether the testimony is based upon 'sufficient facts or data,' whether the testimony is the 'product of reliable principles and methods,' and whether the expert 'has applied the principles and methods reliably to the facts of the case.'" *Id*. at 529.

The relevance inquiry ensures "that there is a 'fit' between the testimony and the issue to be resolved by the trial." *Greenwell v.*

*Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999); *Daubert*, 509 U.S. at 591 ("'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."). Indeed, "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92.

The reliability inquiry focuses on the methodology and principles which form the basis of the testimony, *Greenwell*, 184 F.3d at 497, and is designed to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). An expert's testimony must be based on "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. Neither *Daubert* nor the Federal Rules of Evidence requires a court to admit opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

In determining whether an expert's opinion is reliable, the Court does not "determine whether it is correct, but rather [determines] whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal*, 527 F.3d at 529-30. Typically, a key question for the

9

Court to consider in determining whether a technique or method is reliable is whether the technique or method can be (and has been) tested. *Kaplan*, 748 F.3d at 752 (quoting *Daubert*, 509 U.S. at 593).

Other factors the Court may consider in deciding the reliability of an expert's opinions include: (1) whether the expert's theory or technique "has been subjected to peer review and publication"; (2) whether there is a high "known or potential rate of error" with respect to a particular technique, and whether there are "standards controlling the technique's operation"; and (3) whether the theory or technique enjoys "'general acceptance'" within the "'relevant scientific community,'" or "'has been able to attract only minimal support within the community.'"  *Daubert* 509 U.S. at 593-94 (citation omitted).  Notably, the "reliability" inquiry is "flexible." *Kumho Tire*, 526 U.S. at 141-42.  *Daubert's* list of factors neither necessarily nor exclusively applies to all experts or in every case; the Court has wide latitude in assessing reliability.  *Id.*

## IV.   COMMON ISSUE CONCERNING ALL EXPERTS

Before discussing the parties' specific motions, it makes sense to address a common issue raised by both parties.  Both parties move to exclude portions of experts' reports and expert testimony which consist of nothing more than fact witness testimony, such as factual narratives;

recitation of, or commentary on, case documents and/or witness testimony; and inferences from non-technical evidence.

The parties are correct that it is inappropriate for experts to act merely "as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's 'story.'" *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13-8645, 2018 WL 1889763, at *4 (S.D.N.Y. Apr. 18, 2018). Indeed, simply narrating facts "does not convey opinions that are based on an expert's knowledge and expertise," nor does it trace to a reliable methodology. *Id.*

However, experts may, and to some extent must, set forth facts which provide the basis and reasons for their opinions. *See id.*; *see also Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 664 (6th Cir. 2005) ("[A]n expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation."); *R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." (citation omitted)). While experts may cite facts and case documents to explain how they support an opinion, an expert goes too far if she characterizes the document or makes non-technical inferences from the facts for the purpose of having the fact finder

11

accept her interpretation as fact. *See Scentsational Techs.*, 2018 WL 1889763, at *4.

The parties move to exclude numerous portions of the opposing experts' reports under this argument. JST seeks to exclude: (1) paragraphs 15-22, 41, 46, and 85-113 of Catignani's report; and (2) paragraphs 30-88 of Lange's report. Bosch seeks to exclude: (1) paragraphs 16 and 48 of Randy Griffin's report and pages 2-3 of his rebuttal report; (2) paragraphs 39, 47, 62, 74, and 95 of Dr. George Flowers' report; (3) paragraph 100 of Dr. John Evans' report and paragraphs 34, 56, 80, and 92 of his rebuttal report; (4) paragraphs 30-51, 53, and 78 of Dr. Deepak Goel's report; (5) paragraphs 21-22 of Dr. Jeffrey Suhling's report; and (6) unspecified paragraphs or pages of John Sakowicz's report.

The Court will allow experts to rely on factual information and case documents to support, or provide necessary context to their opinions. However, the parties may not use expert testimony which consists merely of factual recitation or commentary on case documents and fact witness testimony if it does not bear on any scientific, technical or other specialized knowledge, and it is not necessary to provide a basis for the expert's opinions. *See* Fed. R. Evid. 702(a); *Scentsational Techs.*, 2018 WL 1889763, at *4.

From their briefs, it is evident that both sides know – at least generally – the limits of the legal principles set forth above.

Rather than go through the experts' reports paragraph-by-paragraph, the Court RESERVES RULING on the specific objections made by the parties concerning experts' reliance on factual information and case documents that is not necessary to support their opinions.

In many instances, the parties move to exclude the same type of factual narrative included by their own experts and/or proposed opinions on the same or similar issues.  The parties should be able to resolve the majority of disputes raised under this section. Prior to trial, the parties must meet and confer in an effort to *substantially* limit their conflicts under this argument.  For any dispute that remains, the parties can raise objections during testimony at trial.

## V.    JST'S DAUBERT MOTION

JST seeks to preclude the reports and testimony of Catignani and Lange – each of whom principally opines that JST's HIT2 electrical header connector can be reverse engineered.

### A.    Umberto Catignani

Catignani is a materials engineer with a Bachelor's of Science in Materials Engineering from the University of Cincinnati and a Master's of

Science in Polymer Engineering from the University of Akron.  While obtaining his degrees, he interned at IBM and Delphi Packard Electric Systems ("Delphi"), a GM company.  From 1995 until 2000, Catignani worked as a Lead Senior Injection Molding Process Engineer at Delphi.  He has been an independent consultant in the field of injection molding since 2001.

In addition to his principal opinion that JST's HIT2 electrical connector can be reverse engineered, Catignani opines that: (1) JST's purported trade secrets are publicly available and readily ascertainable; (2) the dimensional information JST alleges to be trade secrets does not provide sufficient information to manufacture a replacement part; (3) JST's alleged nondimensional trade secret information is industry standard or could be easily derived, does not identify unique aspects that would be valuable to a competitor, and was not treated as confidential; and (4) based on a comparison of the technical aspects of the drawings and models, JST's HIT2 and the Bosch header connector are different.

JST says the Court should preclude these opinions and related reports because: (1) Catignani lacks the requisite expertise to render these opinions; (2) his opinions are not based on reliable principles or methods; and (3) his opinions are based on insufficient facts and data.

### 1.    Catignani Lacks the Requisite Expertise

JST says Catignani lacks sufficient knowledge, skill, experience, training and education with the design, engineering, testing, validation, implementation, or use of a complex, multi-pin, hybrid, high-density electrical header connector that is at issue here.  The Court agrees.

During his deposition, Catignani admitted he has no experience designing electrical connectors. [ECF No. 530-2, PageID.36184]. Moreover, Catignani has never reverse engineered an electrical connector or any other automotive part – let alone a complex, hybrid, high-density electrical header such as the HIT2.  Catignani's claimed expertise in polymer engineering does not qualify him as an expert in reverse engineering an electrical connector.  His experience is with molding machines and benchmarking a speaker – certainly not relevant to the design, development, fabrication, testing, and reverse engineering of an electrical connector.  He is not qualified to opine on these matters.

### 2.    Catignani's Reverse Engineering Opinions Are Not Based on Reliable Principles or Methods

Catignani attempted two different methods of reverse engineering. Neither resulted in the reverse engineering of the HIT2.  Despite acknowledging that his first method "wasn't good enough," he submitted the method in his first report and claimed that he "performed the industry

15

standard reverse engineering steps. . . ."  Catignani changed the method he used in his rebuttal report, but that method also did not reverse engineer the HIT2.

JST says the Court should exclude Catignani's reverse engineering reports for two reasons.  First, Catignani failed to complete the testing for either of his methods, such that his opinion is based solely on his subjective belief or speculation that his methodology should work, *see Meemic Ins. Co. v. Hewlett-Packard Co.*, 717 F. Supp. 2d 752, 761 (E.D. Mich. 2010) ("[A]n expert's subjective belief or unsupported speculation will not [satisfy Fed. R. Evid. 702].").  Secondly, JST says Catignani does not provide support to demonstrate that his reverse engineering methods and other opinions have been subjected to peer review and publication, have a known or potential rate of error, enjoy general acceptance in the relevant scientific community, or can be (and have been) tested.

Bosch says JST's first argument is contrary to law.  It says an expert does not have to perform all steps of the reverse engineering and need only show that the trade secret can be reverse engineered for his or her opinion to be admissible.  This is not necessarily true.  *See Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 431 (6th Cir. 2007) ("'[H]ands-on testing is not an absolute prerequisite to the admission of expert

16

testimony,' but where a theory easily lends itself to testing and substantiation, 'conclusions based only on personal opinion and experience do not suffice.'" (citation omitted)).

"One way to overcome the testing requirement might be to show that the expert has significant technical expertise in the specific area in which he is [offered to testify]."  *Id*.; *see also Bah v. Nordson Corp.*, No. 00-9060, 2005 WL 1813023, at *8 (S.D.N.Y. Aug. 1, 2005) (finding an expert reliable despite the lack of testing because he had "extensive experience" with the very types of machines at issue in the case).

Here – unlike in *Bah* – Catignani does not have extensive experience with electrical connectors or in reverse engineering them. He cannot overcome the failure to test his methods. *See Johnson*, 484 F.3d at 431.

Considering Catignani's lack of testing and lack of extensive experience with electrical connectors, the Court finds that his opinions are not based on reliable principles or methods.

### 3. Certain Other Catignani Opinions Are Based on Sufficient Facts and Data

JST's focus is to mainly preclude Catignani's opinions regarding reverse engineering.  But it also moves the Court to exclude certain opinions by Catignani because they are not supported by sufficient facts or data.  JST says: (1) Catignani testified that JST's tolerances are industry

17

standard but offered no facts or data to support that opinion and acknowledged that tolerances vary from material to material and process to process; (2) Catignani offers several opinions about JST's Process Failure Mode Effects Analysis ("PFMEA") but did not analyze JST's actual process, and he based his opinion on standard failure modes while admitting during his deposition that the failure modes vary based on part, design, and material; and (3) the Court should exclude Catignani's opinion that JST's materials could be readily ascertained because Catignani did not perform a materials analysis, did not support his opinion with facts or data, and ignored that Foxconn could not determine JST's material.

The Court disagrees with JST and finds that Catignani's opinions on these matters are sufficiently supported based on the facts and data he relied upon, the analysis he provided, and – most importantly – his dimensional measurement analysis experience, materials analysis experience, and PFMEA experience.

### 4.    Catignani's Other Opinions: Pricing, Legal Conclusions, Etc.

JST says the Court should exclude Catignani's pricing opinions because he fails to show he is qualified to testify regarding pricing, he provides no support for his conclusions, and he disregards case facts. Bosch fails to respond to this argument.

The Court excludes Catignani's opinions regarding JST's pricing.

JST also says the Court should preclude the results of Catignani's measurement analysis because they were not derived in a "clean room" and should preclude other parts of Catignani's report because he had others assist him in the collection of data. However, JST does not explain the importance of deriving results in a "clean room" and it fails to cite legal authority supporting these arguments. The arguments fail.

JST next argues that Catignani makes impermissible legal conclusions. Specifically, JST says the Court should exclude Catignani's opinion that JST's trade secrets are publicly available as an impermissible legal conclusion, along with Catignani's opinion that JST disclosed its PPAP trade secrets in documentation to third parties without confidentiality protection.

The Court disagrees. These opinions stop short of asserting legal terminology – i.e., that the trade secrets are not actually trade secrets. *See Raytheon Co. v. Indigo Sys. Corp.*, 598 F. Supp. 2d 817, 821-22 (E.D. Tex. 2009) (explaining that an opinion that a party's trade secrets "do not meaningfully differ from information that is widely known in the industry" is a valid opinion, and not a legal conclusion, because the expert does not "conclude that [certain] trade secrets . . . are not actually trade secrets");

*Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) ("Although an expert's opinion may embrace an ultimate issue to be decided by the trier of fact, the issue embraced must be a factual one." (citation, brackets, and quotation marks omitted) (quoting Fed. R. Evid. 704(a))).

Whether JST's trade secrets are publicly available and whether JST disclosed its trade secrets are factual issues relevant to Bosch's defense. JST will be able to introduce evidence that the trade secrets are not publicly available and that it did not disclose the trade secrets to third parties.  *See id.*

On the other hand, Catignani's opinion would have been an impermissible legal conclusion if he had opined that because the trade secrets are publicly available*, the information cannot be considered trade secrets*.  *See id*. at 822 ("Raytheon reads Simmons' report as concluding that, because elements of these trade secrets may be found in the public domain, the information cannot be considered a trade secret. But Simmons does not reach such conclusions. Of course, if Simmons did draw such conclusions, they would be inadmissible legal opinions.").  However, Catignani did not reach this ultimate legal conclusion.

JST fails to show that the challenged opinions are impermissible legal conclusions.

Finally, on pages 13-14 of its motion, JST identifies by bullet point eight additional opinions/conclusions by Catignani and says the Court should exclude them because other evidence in the record contradicts the opinions/conclusions.  Bosch disagrees.  It says JST's complaints that Catignani's opinions are contradicted by other case facts go to the weight, not admissibility, of Catignani's opinion.  Furthermore, JST's bullet point listing of invalid opinions – without argument or support – is insufficient to have any traction with the Court.

The Court agrees with Bosch and will not exclude the opinions/ conclusions from Catignani's reports listed on pages 13-14 of JST's motion.

### 5.    Catignani Conclusion

The Court excludes Catignani's reverse engineering opinions concerning the HIT2 and his opinions related to JST's pricing.  The Court otherwise allows Catignani's opinions.

### B.    Robert Lange

Lange has over 40 years experience in automotive engineering and holds a Bachelor's and a Master's of Science in Mechanical Engineering from the University of Michigan.  Lange's career covers motor vehicle systems architectures and compartment engineering, vehicle technology development, chassis systems, and collision avoidance – all include

electrical sensors and connectors. Through his work at GM, Failure Analysis Associates and Ford, Lange held titles such as Executive-in-Charge, Engineering Director, Executive Director Vehicle Structure and Safety, Vice President, Principal Engineer and Supervisor.

In addition to opining that a competitor could reverse engineer the HIT2 electrical connector, Lange: (1) opines that JST's alleged nondimensional trade secrets have not been specifically defined or identified to be of value to a competitor; (2) explains how and why JST's alleged dimensional trade secrets are features that can be ascertained through inspection by technical investigators; (3) opines that JST's alleged trade secrets related to regrind limits are not unique to JST and are not necessary to manufacturing automotive electrical connectors; and (4) says JST created its designs in collaboration with Bosch.

JST says the Court should exclude Lange's expert reports and opinions because: (1) he lacks the requisite expertise to opine regarding electrical connectors; (2) his opinion that the HIT2 can be reverse engineered is speculative; (3) Lange did not apply proper methods or rely on sufficient facts to support his opinions; and (4) Lange's reliance on Catignani's report is improper.

### 1. Lange is Qualified

JST says Lange lacks the requisite expertise to opine regarding the HIT2 electrical connector because his entire career was devoted to vehicle structure and safety integration, not electrical components.  JST says Lange has no experience with electrical engineering or designing electrical header connectors.

The Court disagrees.  Although Lange's career in automotive engineering focused on vehicle architecture, structure, and safety integration, Bosch demonstrates that Lange's high-end positions included significant experience and involvement with different types of electrical components, including electrical connectors.  The Court finds that Lange has sufficient experience to qualify him to offer opinions on issues concerning the HIT2 electrical connector.

### 2. Lange's Reverse Engineering Opinion is Not Reliable

In the "Reverse Engineering" section of his report, Lange sets forth a 29-step, "high level" reverse engineering process to "permit the manufacture of an automotive electrical connector."  Lange then summarily concludes that "capable engineers" who follow this process and utilize "common industry standards and GM's specifications for engineering,

manufacture, and quality/process control" can produce "an electrical connector comparable to the JST HIT2 connector."

In support of his reverse engineering opinion, Lange relies on "the expert report of [Catignani] in addition to [his] own knowledge and experience."  Since the Court excludes Catignani's reverse engineering opinions, Lange cannot rely on Catignani's report for his own reverse engineering opinions.

As JST points out, Lange does not specify what knowledge or experience qualifies him to offer his opinion; he does not identify publications or authorities to validate his "process;" and he does not identify any occasion when he or anyone in the world successfully reverse engineered any electrical connector, let alone the HIT2.  Bosch sets forth Lange's qualifications and experience.  However, the Court finds that Bosch fails to show that Lange's reverse engineering process and his related opinions are reliable.  *See Bechak v. ATI Wah Chang*, No. 15-1692, 2017 WL 4541611, at *5 (N.D. Ohio Oct. 11, 2017) ("When a proponent of expert testimony presents 'only the experts' qualifications, their conclusions and their assurances of reliability,' . . . [it is] 'not enough' [to demonstrate reliability] 'under Daubert.'" (citation omitted)).

24

Moreover, Lange's reverse engineering opinions are made further unreliable and unhelpful to the finder of fact because Lange: (1) has never seen or physically examined the HIT2; (2) did not address the time and expense it would take to reverse engineer the HIT2; and (3) only made the list of reverse engineering steps and did not perform them.

The Court finds that Lange's reverse engineering opinions are unreliable. *See Meemic*, 717 F. Supp. 2d at 762 ("[A]n expert's subjective belief or unsupported speculation will not [satisfy Fed. R. Evid. 702]."). The Court excludes Lange's reverse engineering opinions and the corresponding portions of his reports.

### 3. Pricing

JST makes the same arguments regarding Lange's opinions on JST's pricing as it made concerning Catignani's pricing opinions. JST says the Court should exclude Lange's opinions regarding JST's pricing because he fails to show he is qualified to testify regarding pricing, he provides no support for his conclusions, and he disregards case facts.

Bosch fails to respond to this argument.

The Court excludes Lange's opinions regarding JST's pricing.

### 4.   Legal Conclusions

JST makes the same legal conclusions arguments concerning Lange's opinions that it made regarding Catignani's arguments.  The same analysis and conclusion apply to Lange's opinions.

For the same reasons explained above, JST fails to show that the challenged opinions are impermissible legal conclusions.

### 5.   Lange's Other Opinions

JST challenges certain opinions by Lange regarding JST's dimensional trade secrets and design tolerances.

JST says the Court should exclude Lange's opinion that JST's trade secrets 1-119 include "dimensional characteristics that can be replicated by inspection" and are "generally available to technical investigators" because he provides no analysis.

The Court disagrees.  Lange's experience coupled with his reliance on the relevant facts and data – such as JST's trade secret disclosures and GM's standards and requirements – render his opinions regarding the ability to measure the HIT2's dimensional characteristics reliable.

JST also challenges Lange's conclusions that JST's design tolerance are documented in common industry standards and were established by Bosch in collaboration with JST.  JST says the Court should exclude these

conclusions because they lack support and because tolerance are *prima facie* trade secrets.

The Court allows these opinions. Although tolerances are *prima facie* trade secrets, *see Mike's Train House*, 472 F.3d at 410, that simply means they are assumed to be trade secrets. It does not entirely preclude the possibility that the design tolerances become commonly known in the industry. Nor does it preclude the possibility that JST's tolerances were established in collaboration with Bosch. Whether JST's design tolerances are trade secrets is an issue for the jury; the Court will not find that they are as a matter of law.

### 6.    Lange's Reliance on Catignani's Report

JST says Lange's reliance on Catignani's report is improper because: (1) Catignani's opinions are unreliable; and (2) Lange did not have Catignani's report or know its contents prior to completing his own report. Bosch says Lange's reliance on Catignani's report is proper.

With respect to JST's first argument, the Court finds that Lange cannot rely on Catignani's report to the extent the Court excludes it and/or excludes Catignani's related opinions. On the other hand, Lange may rely on parts of Catignani's report that are admitted into evidence.

JST cites to page 23 of Lange's deposition for its second argument. However, that page does not support JST's contention that Lange did not have Catignani's report or know its contents before completing his own report.  The Court disregards this argument.

### 7.    Lange Conclusion

The Court excludes Lange's reverse engineering opinions and his opinions on JST's pricing.  The Court allows Lange's other opinions.

## VI.   BOSCH'S DAUBERT MOTION

Bosch challenges six of JST's proposed experts: (1) John Sakowicz ("Sakowicz"); (2) Randy Griffin ("Griffin"); (3) John Evans ("Dr. Evans"); (4) George Flowers ("Dr. Flowers"); (5) Deepak Goel ("Dr. Goel"); and (6) Jeffrey Suhling ("Dr. Suhling").  Bosch moves to preclude: (1) the reports and testimony of Sakowicz entirely; and (2) certain testimony and portions of the reports of the five other proposed experts.

After first arguing to exclude Sakowicz entirely, Bosch organizes its remaining motion based on the argument being made, not by the expert. Specifically, Bosch argues that the Court should: (1) bar JST's experts from offering opinions outside their expertise; (2) exclude JST's experts' legal conclusions; (3) exclude Dr. Evans' and Dr. Flowers' testimony about the parties' state of mind, intent, and business ethics; (4) bar JST's experts

from offering opinions not based on reliable principles and methods; and (5) preclude JST from offering cumulative expert testimony.  The Court will addresses each argument.

### A.    JST Timely Disclosed and Properly Designated Sakowicz as an Expert Witness

Bosch first moves the Court to strike the reports and testimony of Sakowicz, arguing that: (1) he is a fact witness who JST failed to timely disclose; and (2) JST's expert designation of Sakowicz is improper.

Sakowicz worked for GM for 28 years.  From 2004 to 2008, he was responsible for the entire GM Global Catalog of unsealed electrical connectors and unsealed connection system interfaces and was the GM lead engineer in the sourcing and development of newly designed unsealed connection systems for global GM use.  As such, Sakowicz has knowledge and experience relevant to the technology at issue in this case.  Moreover, although he did not have involvement with the HIT2 connector, he does appear to have direct, personal knowledge of certain facts relevant to the underlying dispute.

Fact discovery closed on July 1, 2019.  JST notified Bosch that it selected Sakowicz as one of its experts later that month.

Bosch says JST's expert designation of Sakowicz is improper.  It says Sakowicz is a fact witness and that JST's failure to disclose him

during fact discovery violated Fed. R. Civ. P. 26(a)(1)(A)(i), which "requires parties to disclose early in discovery persons likely to have discoverable information if the disclosing party may use that information or person to support its claim or defense." *Abrams v. Nucor Steel Marion, Inc.*, 694 Fed. Appx. 974, 982 (6th Cir. 2017).

Bosch says the Court should exclude Sakowicz under Fed. R. Civ. P. 37(c)(1). Rule 37(c)(1) provides an exclusionary sanction for failure to disclose a witness as required by Rule 26(a) unless the non-disclosing party shows that the violation was substantially justified or harmless. *Abrams*, 694 Fed. Appx. at 982.

JST says it properly designated Sakowicz as an expert; it timely disclosed him as an expert to Bosch; and Sakowicz provided an expert report and testimony regarding his expertise in connection systems.

In addition to his personal knowledge of facts relevant to the underlying dispute, Sakowicz has significant experience in automotive engineering, including experience involving vehicle connection systems and electrical header connectors like the HIT2. Sakowicz's personal knowledge of certain facts related to the underlying dispute does not preclude him from being an expert. *See Innovation Ventures, LLC v. NVE, Inc.*, 90 F. Supp. 3d 703, 724 (E.D. Mich. 2015) ("'*Daubert's* list of specific

factors neither necessarily nor exclusively applies to all experts or in every case'; in some cases the relevant reliability concerns may focus upon personal knowledge or experience.'" (citation omitted)).  The Court finds that JST properly designated Sakowicz as an expert and timely notified Bosch of his expert designation.

Moreover, even if JST should have disclosed Sakowicz during fact discovery, the failure to do so was harmless in light of the five harmlessness factors set forth in *Abrams*, 694 Fed. Appx. at 982.  Although Bosch summarily states that it was "significant[ly] prejudice[d]" by JST's failure to disclose Sakowicz until one month after fact discovery closed, Bosch does not explain how it was prejudiced.  Bosch was able to depose Sakowicz; it will not be prejudiced by allowing Sakowicz's testimony at trial.

### B.    Opinions Outside Expertise

Bosch next moves to bar JST's experts from offering opinions outside the areas of their expertise.  It makes arguments concerning Sakowicz, Dr. Evans, and Dr. Flowers.

#### 1.    John Sakowicz

Bosch argues that Sakowicz is not qualified to be an expert.  It says Sakowicz relies on his personal experience and first-hand knowledge of certain facts from working with JST while employed at GM – not on any

expertise.  Bosch highlights that Sakowicz has never been an expert in another case and has not worked in the automotive industry since November 2008.  Bosch also says Sakowicz does not even consider himself an expert in any field.

With respect to the latter statement, Bosch cites to Sakowicz's deposition testimony and says the Court should exclude him as an expert because he disclaims any expertise.  However, in making this argument, Bosch blatantly misrepresents the record.

Bosch highlights the following testimony from page 12 of Sakowicz's deposition transcript for the proposition that Sakowicz disclaimed any expertise: "[W]ould I consider myself an expert . . . in any particular facet of engineering?  That would be a strange question, because I don't want to -- I'm not that vain to say that I am."  However, Bosch completely ignored the remainder of Sakowicz's answer, in which he said that his "experience would allow [him] to [offer] opinion[s] on certain matters" as an expert witness.  Bosch also ignored Sakowicz's testimony at the bottom of page 12 and onto page 13 of his deposition transcript, where he: (1) said his experience would qualify him to offer opinions regarding three areas of automotive engineering – electromechanical sensors and switches, occupant safety performance, and power distribution componentry; and (2)

explained that his experience in "power distribution componentry" was what was relevant to this case, as it referred to "[e]lectrical . . . wiring[] and the components that go into wire harnesses: [c]onnectors, terminals, crimping technologies, those types of things."

Contrary to Bosch's assertion, Sakowicz did not disclaim any expertise. He testified that his automotive engineering experience qualified him to offer expert opinion testimony regarding electrical componentry, wire harnesses, and electrical connectors – the precise type of technology at issue here. The Court agrees. Sakowicz's extensive experience at GM in electrical connectors, wire harnesses, and electrical wiring and componentry qualifies him to be an expert. Bosch even acknowledges in its reply brief that Sakowicz has knowledge regarding, and experience working with, the technology related to the HIT2 connector, interface and wire harness for the type of automobile connection system at issue.

The fact that Sakowicz has never been an expert witness before does not preclude him from being an expert now since his knowledge and experience in automotive electrical componentry qualifies him to offer his opinions; in some respects, one could say he may be more reliable than a career expert witness who regularly testifies on behalf of the same type of party (e.g., personal injury plaintiffs or tobacco industry companies) and

who invariably offers the same or similar type of conclusion.  And the fact that Sakowicz has not worked in the automotive industry for over ten years does not disqualify him as an expert, either.  However, it is a fact that the jury could possibly consider in determining the weight to give Sakowicz's testimony.

The Court finds Sakowicz sufficiently qualified to offer his opinions.

### 2.    Dr. Evans

Bosch argues that the Court should exclude Dr. Evans' opinions and testimony regarding the cost to reverse engineer the HIT2 header – *see* ¶¶ 60-70 of his report and ¶¶ 45, 61-69 of his rebuttal report – because they are outside his area of expertise.  Bosch says Dr. Evans is a professor in the area of electrical and industrial systems engineering and not an expert in economics, costing, or any other discipline that would qualify him to offer an opinion on what it would cost to reverse engineer the HIT2.

In response, JST says Dr. Evans has significant experience in costing, citing the following in support: (1) Dr. Evans' testimony regarding his "experience with business practices in the automotive industry, specifically with body control modules and their components (e.g., connectors)"; (2) Dr. Flowers' testimony that Dr. Evans has a deep understanding of financial issues, including costing and the general

34

operations of an auto manufacturer; (3) finance and management positions

Dr. Evans held at Chrysler – including Senior Business Analyst, Senior

Financial Specialist, Manager of Advanced Technology, and Manager of

Strategic Business and Advanced Technology; and (4) Dr. Evans'

testimony regarding his experience in the manufacturing planning that goes

into the development of an entire body control module, including the

connectors.

JST fails to establish that Dr. Evans has the requisite experience to

offer an opinion regarding how much it would cost to reverse engineer the

HIT2.  Particularly, JST fails to explain how Dr. Evans' background in

"business practices in the automotive industry" and his prior finance and

management positions at Chrysler support his opinion on the cost of

reverse engineering the HIT2 under the circumstances of the information

and technology available to the market.  Moreover, neither Dr. Flowers' nor

Dr. Evans' testimony provides an explanation as to the type of cost analysis

with which Dr. Evans had experience.  Dr. Evans' general background in

business practices in the automotive industry and finance do not qualify

him to render a general opinion in any area, or at least not regarding the

cost of reverse engineering the HIT2.  *See King v. Enter. Rent-A-Car Co.*,

231 F.R.D. 255, 267 (E.D. Mich. 2004) (excluding testimony of an expert

who had general statistical experience but no specific experience that would bear on the employment statistics opinion he was rendering).

The Court excludes Dr. Evans' testimony regarding the cost to reverse engineer the HIT2 connector.

### 3. Dr. Flowers

Bosch moves the Court to exclude Dr. Flowers' opinions (*see* ¶ 37 of his report) and testimony regarding "industry practice" (i.e., Dr. Flowers' opinion that Bosch's act of copying JST's information and providing it to a JST competitor was a violation of industry practice).  Bosch says Dr. Flowers is not qualified to offer opinions on industry practice because he is a mechanical engineering professor and has no experience working in the automotive supply industry.

JST says it is untrue that Dr. Flowers has no automotive industry experience.  It says Dr. Flowers – a professor at Auburn University – has worked with Chrysler and other automotive suppliers in connection with his work at the Center for Advanced Vehicle and Extreme Environment Electronics ("CAVE3") – an academic research center that sometimes collaborates with members of the automotive industry.  JST also says Dr. Flowers worked with several connector companies when he headed CAVE's connector's group.

While JST says Dr. Flowers worked with members of the automotive industry while working at CAVE, it fails to explain the type and extent of work Dr. Flowers engaged in at CAVE.  Most notably, however – as Bosch points out in its reply – JST fails to explain how Dr. Flowers' work as an academic consultant gives him the expertise to opine on acceptable practices within the automotive industry.

The Court excludes Dr. Flowers' testimony regarding "industry practice."

### C.    The Court Excludes JST's Experts' Legal Conclusions

Bosch moves the Court to exclude the following opinions as impermissible legal conclusions: (1) ¶ 26 from Dr. Evans' report – "it is my opinion that JST's HIT2 header design, and each of the 116 of the dimensions and tolerances asserted as trade secrets by JST are trade secrets"; (2) ¶ 3 from Dr. Goel's report – "it is my opinion that . . . JST's Trade Secrets 120-122, 126-127 and 146 do meet the definition of a trade secret under MUTSA"); (3) the following excerpt from page 8 of Dr. Suhling's report – "it is my opinion that [the] following items constitute trade secrets and were misappropriated by Bosch: [list of nine of JST's alleged trade secrets]"; and (4) ¶ 22 from Dr. Flowers' report – "it is my opinion that the HIT2 trade secret design features and production processes were not

readily ascertained by Bosch through proper means and are not readily ascertainable through proper means."

With the exception of Dr. Flowers' opinion, JST does not contest the exclusion of these opinions as impermissible legal conclusions. The Court excludes them; they are legal conclusions on the ultimate issue and tell the jury what result to reach. *See Dow Corning Corp. v. Jie Xiao*, No. 11-10008, 2013 WL 992773, at *15 (E.D. Mich. Mar. 13, 2013) (excluding expert's opinion that the "claimed trade secrets [a]re not trade secrets according to the legal definition" as an impermissible legal conclusion); *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997) ("[T]estimony offering nothing more than a legal conclusion—i.e, testimony that does little more than tell the jury what result to reach—is properly excludable under the Rules.").

JST says Dr. Flowers' opinion should not be excluded because an expert can testify regarding whether a trade secret is ascertainable by reverse engineering. While JST is correct, Dr. Flowers' opinion goes beyond that and directly tracks statutory terms of art (i.e., "readily ascertainable by proper means"). Dr. Flowers' opinion is an impermissible legal conclusion, and the Court excludes it.

38

**D.    The Court Excludes JSTs' Experts' Opinions About a Parties' State of Mind, Intent, and Business Ethics and Opinions Assessing a Witness' Credibility**

Bosch says that the Court should exclude Dr. Evans' and Dr. Flowers' opinions and testimony about the parties' state of mind, intent, and business ethics and their opinions and testimony assessing the credibility of Bosch fact witnesses.

**1.    Dr. Evans' Opinions About Bosch's Business Ethics**

Bosch moves to exclude paragraphs 70-72 and 101 of Dr. Evans' report and paragraph 58 of his rebuttal report; it says they assess the ethics of Bosch's business conduct:

> ¶ 70 – "[U]sing proprietary design information for purposes of 'cloning' a design to give to competitors is one of the highest levels of unethical professional behavior."
>
> ¶ 71 – "It is also my opinion that providing detailed manufacturing process information from a site visit to other companies, especially competitive suppliers, is absolutely unethical without the permission of the company owning the process knowledge."
>
> ¶ 72 – "To be clear, it is absolutely unethical for a customer to give a supplier's PPAP information to a competitor without the approval of the supplier."
>
> ¶ 101 – "Any information given to Foxconn (or other connector suppliers) by Bosch from the JST PPAP is unacceptable business practice and absolutely unethical."
>
> ¶ 58 – "In my experience as an automotive executive . . . this practice is considered highly unethical and against standard business practices."

JST does not address whether opinions regarding a party's business ethics are allowed.  It instead focuses on Bosch's argument that JST's experts offer opinions on a party's state of mind and intent (which this Court addresses below).  JST says its experts do not offer opinions on a party's state of mind or intent.  This argument is irrelevant to Dr. Evans' five above opinions. Regarding those, JST offers a single sentence: "Evans [sic] opinion [sic] in paragraphs 58, 70-72, and 101 is [sic] a comparison of identified Bosch conduct and industry practice and Bosch's own code of conduct."

While expert testimony regarding common industry practice may be relevant and admissible, JST does not show why Dr. Evans' five above opinions are relevant.  Moreover, in them, Dr. Evans' does not compare Bosch's alleged conduct to common industry practice; he opines that Bosch's alleged conduct is unethical.  This is not relevant.  *See In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 544 (S.D.N.Y. 2004) ("expert opinion as to the ethical character of their actions simply is not relevant").

The Court excludes Dr. Evans' opinions assessing the ethics of Bosch's alleged business conduct.

### 2.   Dr. Evans' Opinions Assessing the Credibility of Bosch Fact Witnesses

Bosch says the Court should exclude paragraphs 44, 60, and 61 of Dr.

Evans' report because they assess the credibility of Bosch fact witnesses

Rajesh Das and Jim Finn:

> ¶ 44 – "These discussions [I had with JST employees] clearly contradict Mr. Das' implications that JST's design team was not competent."
>
> ¶ 60 – "From his testimony (7/25/18), Mr. Finn tries to mince words (page 42) with the difference between 'we send' and 'we sent.'"
>
> ¶ 61 – "Mr. Finn tried to create confusion with his comments as to the origination of the Bosch design."

JST argues these opinions are admissible.  With respect to

paragraph 44, JST says there, Dr. Evans draws a comparison between

JST's actual industry experience and that asserted by Bosch personnel

(i.e., that JST's design team was "not competent").  And in paragraphs 60-

61, JST says Dr. Evans provides background facts for his opinion in

paragraph 62.

The Court excludes Dr. Evans' opinions in paragraphs 44, 60, and

61.  "An expert cannot testify about a witness' credibility. The jury, not the

expert, evaluates credibility."  *MAR Oil Co. v. Korpan*, 973 F. Supp. 2d 775,

786 (N.D. Ohio 2013).  Moreover, expert opinions are not necessary to

compare witness testimony to other evidence in the case; the jury can do this on its own.

### 3. Dr. Flowers' Opinions About the Parties' State of Mind and Intent

Bosch moves to exclude paragraphs 75 and 79 of Dr. Flowers' report as opinions on state of mind and intent:

> ¶ 75 – "Bosch led JST to believe that the plant visit was to help new personnel at Bosch to better understand JST and to check the manufacturing processes of the HIT2 header and another connector."

> ¶ 79 – "Bosch always intended to provide Foxconn with 'the issues and solutions JST had' regarding manufacturing and production."

JST does not respond.

These opinions concern Bosch's state of mind and intent and are improper. *See In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 348 F. Supp. 3d 698, 718 (S.D. Ohio 2016) (courts typically bar expert opinions or testimony concerning a corporation's state of mind, subjective motivation, or intent; such testimony is improper because it describes lay matters which a jury is capable of understanding and deciding without the help of an expert).

The Court excludes paragraphs 75 and 79.

### E.    The Court Excludes JST's Experts' Opinions that Are Not Based on Reliable Principles and Methods

Bosch moves to exclude certain opinions by Griffin and Drs. Flowers and Goel, arguing they are not based on reliable principles and methods.

Bosch says the Court should exclude Dr. Flowers' opinion that JST's prints models and "all math data" are confidential, from paragraph 45 of his report.  Bosch says this opinion is a bare conclusion that simply parrots JST's litigation position, and that Dr. Flowers fails to provide any support or reliable methodology to explain how he arrived at it.  Bosch also says the Court should exclude Dr. Flowers' opinion that it would be "impossible" to measure the dimensions of the HIT2 header with a commonly used measuring device – from paragraphs 65, 70, and 100 of his report – because Dr. Flowers: (1) did not provide any support or explanation for how he reached this conclusion; (2) did not attempt to measure any dimension of the HIT2; and (3) fails to account for the fact that JST measured the HIT2 header's dimension with precision.

Bosch says the Court should exclude Dr. Goel's opinion that various aspects of JST's claimed trade secrets are confidential and his opinion that JST derives independent economic value from its claimed trade secrets – from ¶¶ 53, 55 of his report.  Bosch says these opinions are conclusory and unreliable because Dr. Goel fails to cite any support or provide any

43

explanation for how he reached the conclusions other than by reviewing the discovery record.

Finally, Bosch says the Court should exclude as unreliable Griffin's opinion that Bosch copied JST's HIT2 connector design (¶¶ 32-37 of his report) because he based that opinion on a comparison of 3D models performed by a JST employee using software that Griffin cannot operate and without verifying that the data entered into the software was accurate. Similarly, Bosch says the Court should exclude Griffin's opinion that the HIT2 cannot be reverse engineered without substantial time and expense because: (1) it relies on Dr. Evans' and Dr. Flowers' opinions; (2) Griffin offers no analysis of his own to support his opinion or the opinions upon which he relied; and (3) Griffin could not support his opinion since he has never performed any reverse engineering.

JST does not specifically address any of the expert opinions Bosch challenges. Particularly, JST does not attempt to show that these experts support their challenged opinions with sufficient facts or data, nor does it try to demonstrate that the experts use reliable methodologies to reach their opinions.

Instead, JST summarizes case law and summarily states that: "Each [JST expert] relies on expertise and education and has applied it to the

facts of the case, in methodical and principled ways that are technically sound and will ultimately be helpful to the fact finder in this case" and "Each JST expert through physical testing, or through analysis…, follow accepted, technical methods and principles to reach their respective opinions."

JST's conclusory response fails to adequately respond to Bosch's specific arguments.  *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) ("It is the proponent of the testimony that must establish its admissibility by a preponderance of proof.").  Bosch's challenges are valid; the contested opinions lack sufficient support and are not based on reliable principles and methods.

"Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions."  *R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) (citation omitted).  "[A]n expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation."  *Id.*

As Bosch says, Drs. Flowers and Goel merely offer their conclusory opinions and fail to include how and why they reached them.  Since support is lacking, the Court cannot find the challenged opinions are based on sufficient facts and data, or that they are the product of reliable principles and methods, as required by Fed. R. Evid. 702.  *See id.*; *Henry v. City of*

*Flint*, No. 17-11061, 2019 WL 2207669, at *5 (E.D. Mich. Apr. 19, 2019) (excluding proposed opinions which the expert explained were "[b]ased upon [his] review of the facts . . . and [his] training and experience" upon concluding that the expert's support for his opinions was "not 'analysis,' but rather, [the expert's] own say-so").

Griffin's opinions are unreliable because Griffin offers no analysis of his own to support his conclusions and because they are based on his reliance on analyses and assumptions of others without independently verifying their facts and methods. *See id.*; *United States v. Tipton*, 269 Fed. Appx. 551, 559-60 (6th Cir. 2008) (finding an opinion unreliable because the proposed expert failed to verify the facts upon which he based his conclusions).

Moreover, mere "expert experience" to buttress these opinions is not good enough. *See Walbridge Aldinger Co. v. Aon Risk Servs., Inc. of Pa.*, No. 06-11161, 2007 WL 1219036, at *2-3 (E.D. Mich. Apr. 25, 2007) (excluding expert's opinion despite his "qualifications and lengthy service in the industry" where the expert "fail[ed] to include the bases and, more significantly, the reasons for his conclusions and the manner in which he arrived at those conclusions").

The Court excludes the challenged opinions of Griffin and Drs. Flowers and Goel.

### F.    Limits on Cumulative Expert Testimony

Bosch says the Court should preclude JST from presenting cumulative expert testimony under Federal Rule of Evidence 403. Particularly, Bosch says: (1) each of JST's six expert witnesses offers an opinion on whether JST's claimed trade secrets can be reverse engineered; (2) each of JST's experts except for Griffin offers an opinion on whether JST's claimed trade secrets were readily ascertainable and would have had independent economic value to a competitor; (3) each of JST's experts except for Dr. Suhling opines that Bosch copied JST's design for the HIT2 header; and (4) Sakowicz and Drs. Evans and Goel each opine that Bosch did not co-develop and does not co- own the HIT2 header. Bosch says the Court should limit JST to calling no more than two expert witnesses on any subject.

JST says Bosch makes sweeping nonspecific allegations that JST's expert trial testimony will be cumulative and redundant without identifying sections of JST expert reports that are cumulative or identical.  JST argues that its experts have complimentary expertise and function together as a team capable of covering all issues, without overlapping.  JST says there

are 146 trade secrets at issues – including dimensions, tolerances, production processes, quality control, and pricing – and its experts opine on unique aspects of each. JST summarizes each expert's testimony to show how its experts offers opinions on different aspects of the issues Bosch claims there will be duplicative testimony.  JST says the Court should deny Bosch's request because the testimony will not be duplicative.  It also says Bosch's objection relies on Federal Rule of Evidence 403 – not Rule 702 – and is premature.

Under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403. *See also In re FCA US LLC Monostable Elec. Gearshift Litig.*, 382 F. Supp. 3d 687, 694 (E.D. Mich. 2019) (excluding testimony of expert where, among other things, it "would be cumulative and wasteful of the Court's time" given that the defendant had proffered another expert on the same topic).

The Court will limit the parties' presentation of evidence at trial.  The Court may limit cumulative evidence if – pursuant to Fed. R. Evid. 403 – "its probative value is substantially outweighed by a danger of . . . wasting time, or needlessly presenting cumulative evidence."  However, it is unnecessary

and premature to determine at this juncture what evidence is cumulative and should be excluded under Rule 403.

This is particularly true because the Court will likely impose time constraints on the parties at trial (e.g., JST has 35 hours to present its case in chief; Bosch has 20 hours to present its case in chief; and JST has 10 hours for rebuttal) – which itself should help to alleviate cumulative evidence concerns. *See Michigan First Credit Union v. Cumis Ins. Soc. Inc.*, No. 05-CV-74423, 2009 WL 1664088, at *7 (E.D. Mich. June 15, 2009) ("The Court has broad discretion in establishing reasonable time limits on this trial."); *United States v. Reaves*, 636 F. Supp. 1575, 1580 (E.D. Ky. 1986) ("Given my experience in one long trial, this technique has considerable benefits—primarily five: It requires counsel to exercise a discipline of economy choosing between what is important and what is less so. It reduces the incidence of the judge interfering in strategic decisions. It gives a cleaner, crisper, better-tried case. It gives a much lower cost to the clients. Finally, it will save months of our lives.").

## VII.   CONCLUSION

As set forth above, the Court **GRANTS IN PART**, **DENIES IN PART**, and **RESERVES RULING IN PART** on: (1) JST's *Daubert* motion [ECF Nos. 514, 515]; and (2) Bosch's *Daubert* motion [ECF No. 527].

**IT IS ORDERED**.

s/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  June 15, 2021